UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE


PATRICIA STEPHENS, *ET AL*.      )
                                 )
v.                               )      NO.  2:07-CV-175
                                 )             CONSOLIDATED
KOCH FOODS, LLC                  )
                                 )
                                 )
                                 )
PATRICIA STEPHENS, *ET AL*.      )
                                 )
v.                               )
                                 )
CITY OF MORRISTOWN,              )
TENNESSEE                        )


## MEMORANDUM OPINION

The plaintiffs have filed this citizen's suit alleging violations of the

Federal Water Pollution Control Act, commonly known as the Clean Water Act

("CWA"), 33 U.S.C. § 1251-1387 (2009), and state law nuisance, trespass,

negligence, and inverse condemnation actions.  This matter is before the Court on

three separate motions for summary judgment.  They are:  (1) plaintiffs' motion for

partial summary judgment as to both defendants, [Doc. 71]; (2) Defendant Koch

Foods, LLC's ("Koch Foods") motion for partial summary judgment, [Doc. 63][1]; and

_____

[1]   Although styled as a motion for summary judgment, Koch Foods' motion does not
seek summary judgment on all of plaintiffs' claims.

(3) Defendant City of Morristown's ("City") motion for summary judgment as to all claims, [Doc. 58]. The parties have filed lengthy responses and replies [2], and all matters are ripe for review.[3] The Court will discuss the issues in turn after summarizing the facts, including all pertinent permit clauses, and the standard of review.

## I.    FACTS

The United States Environmental Protection Agency ("EPA") has issued the City a National Pollutant Discharge Elimination System permit ("NPDES permit"), No. TN 0023507, through the Tennessee Department of Environment and Conservation ("TDEC"), to which authority to implement the permitting provisions of the CWA have been delegated. The NPDES permit authorizes the Morristown Sewer Treatment Plant to discharge treated municipal wastewater into the Holston River at Mile 75. According to the permit, the City is a "control authority" for enforcing general pretreatment regulations. The City has contracted Veolia Water

---

[2]Regarding some filings, the defendants failed to follow the local rules and the Scheduling Order by not submitting courtesy copies to this Court. The Scheduling Order states, "Any party filing a motion, response, reply, objection or any other document requiring action by the Court which exceeds ten (10) pages in length, including exhibits, shall within five (5) days of filing furnish a copy to chambers for use by the Court." (Emphasis added.) Much time and many resources were expended in printing and assembling the necessary documents.

[3]  The parties have not requested oral argument on these motions and the Court agrees that oral argument is unnecessary.

North America ("Veolia") for the operation of the Morristown sewer system. Under the NPDES permit and the Morristown Water Pollution Control Ordinance ("City Ordinance"), the City issues Industrial User Permits ("IUP") to industrial facilities. These permits authorize the discharge of wastewater into the Morristown sewer system under certain conditions.

More specifically, the permit states that the City "shall implement and enforce the Industrial Pretreatment Program in accordance with Section 403(b)(8) of the Clean Water Act, the Federal Pretreatment Regulations 40 CFR 403, Tennessee Water Quality Control Act Part 63-3-123 through 63-3-128 . . . ." The permit provides, in part, that the City shall:

> a. Carry out inspection, surveillance, and monitoring procedures which will determine, independent of information supplied by the Industrial user (IU), whether the IU is in compliance with the pretreatment standards;
>
> b. Require development, as necessary, of compliance schedules for each IU for the installation of control technologies to meet applicable pretreatment standards;
>
> c. Require all industrial users to comply with all applicable monitoring and reporting requirements outlined in the approved pretreatment program and IU permit; [and]
>
> d. Maintain and update, as necessary, records identifying the nature and character of industrial user discharges, and retain such records for a minimum of three (3) years[.]

. . . .

In addition, the NPDES permit requires the City to "enforce 40 CFR 403.5 prohibited discharges." The permit also states that the City "shall at all times properly operate and maintain all facilities and systems (and related appurtenances) for collection and treatment which are installed or used by the [City] to achieve compliance with the terms and conditions of [the] permit." Finally, regarding overflows and upsets, the permits states, "Overflows are prohibited." An overflow "means the discharge to land or water of wastes from any portion of the collection, transmission, or treatment systems other than through permitted outfalls." An upset "means an exceptional incident in which there is unintentional and temporary noncompliance with technology-based effluent limitations because of factors beyond the reasonable control of the [City]." Additionally,

> An upset shall constitute an affirmative defense to an action brought for noncompliance with such technology-based permit effluent limitations if the [City] demonstrates, through properly signed, contemporaneous operating logs, or other relevant evidence that:
>
> i.  An upset occurred and that the [City] can identify the cause(s) of the upset;
>
> ii.  The permitted facility was at the time being operated in a prudent and workmanlike manner and in compliance with proper operation and maintenance procedures;

-4-

iii. The [City] submitted information required under "Reporting of Noncompliance" within 24-hours of becoming aware of the upset (if this information is provided orally, a written submission must be provided within five days); and

iv. The [City] complied with any remedial measures required under "Adverse Impact."

Koch Foods operates a poultry debone plant ("Plant 2") at 1620 Progress Parkway in the East Tennessee Progress Center Industrial Park ("ETPC"), Morristown, Tennessee. Plant 2 processes chickens by cutting the meat for breasts, wings, and tenders. The chickens are supplied by a separate Koch Foods facility in Morristown. After processing, the meat is taken to other Koch Foods facilities for cooking or further processing. The operations conducted at Plant 2 were once conducted at another Koch Foods facility ("Plant 1") located at 4901 East Morris Boulevard in Morristown. The operations of Plant 1 were transferred to Plant 2 in February 2005.

The City installed and operates (via Veolia) the Witt sewer line. The line includes four pump stations–Witt 1, Witt 2, Witt 3, and a station inside the ETPC. The sewer line runs from the ETPC through the Witt and Roe Junction Communities to the Morristown Sewer Treatment Plant.

On April 30, 2003, the City issued an Industrial User Permit ("IU

permit"), No. 1017, to Koch Foods, Plant 1, which was to expire on May 1, 2005. The permit authorized the discharge of industrial wastewater into the Morristown sewer system from Plant 1's location on Morris Boulevard. In addition, it stated in Part one, section A, "During the period of May 1, 2003 to May 1, 2005, the permittee is authorized to discharge process wastewater to the City of Morristown sewer system from the below listed outfall(s)." These listed outfalls were named 001 and 002. Section B stated, "During the period of May 1, 2003 to May 1, 2005, the discharge from outfall 001 shall not exceed the following effluent limitations. Effluent from this outfall consists of **unregulated process water** from the plant and equipment wash down, poultry washing operation, non-contact cooling water for ice, drainage from offal trailer, as well as, sanitary wastewater." The "Conventional Pollutants" category of this section listed 250 milligrams per liter of BOD and TSS and 100 milligrams per liter of FOG. The permit further stated that all three were "Subject to Surcharge Fee."

Also, Part five, section B, condition two stated, "The permittee must comply with all conditions of this permit. Failure to comply with the requirements of this permit may be grounds for administrative action, or enforcement proceedings including civil or criminal penalties, injunctive relief, and summary abatements." Condition five stated that the permit may be terminated for "failure to meet effluent

limitations." Condition eleven stated the "General Prohibitive Standards," which included, in pertinent part:

> The permittee shall not discharge wastewater into the public sewer, POTW [publicly owned treatment works], or any receiving stream any of the following described pollutants:
>
> . . . .
>
> c.   Solid of viscous substances such as ashes, cinders, sand, mud, straw, shavings, metal, glass, rags, feathers, tar, plastics, woods, paunch, or manure capable of causing obstructions or other interference with the proper operation of the treatment plant:
>
> d.   Any pollutant, including BOD and COD pollutants, released at a flow rate and/or pollutant concentration that either alone, or in interaction with other substances, will cause interference with the treatment plant or constitute an adverse environmental impact;
>
> . . . .
>
> g.   Pollutants which contain noxious, malodorous gases or substances in quantities that would constitute a public nuisance or hazard to life, or that might result in the creation of toxic gases, vapors, or fumes with the POTW;
>
> . . . .
>
> p.   Wastewater containing any element or compound known to act as a lacrimator, known to cause nausea, or known to cause odors constituting a public nuisance.

Furthermore, Section F stated that "significant noncompliance" includes:

-7-

a. Chronic violations of wastewater discharge limits, defined here as those in which sixty-six percent or more of all the measurements taken during a six-month period exceed (by any magnitude) the daily maximum limit or the average limit for the same pollutant parameter;

b. Technical Review Criteria (TRC) violations, defined here as those in which thirty-three percent or more of all the measurements for each pollutant parameter taken during a six-month period equal or exceed the product of the daily maximum limit or the average limit multiplied by the applicable TRC (TRC = 1.4 for BOD, TSS, fats, oil, and grease, and 1.2 for all other pollutants except for pH).

Finally, Part six stated the following:

The City may accept waste for treatment at the POTW that contains excessive quantities of compatible pollutants. In the event the City elects to accept such waste for treatment, a surcharge shall be charged based upon the strength of the discharge up to the maximum levels established herein. Wastes that exceed the maximum levels established herein shall be deemed noncompatible, and shall not be accepted for treatment by the POTW except as specified herein. The surcharge for compatible pollutants shall be calculated as established in Appendix B "Surcharge Fees."

The permit does not include a list of the maximum levels. Appendix B lists a formula for calculating the surcharge and listed the price per pound for BOD, TSS, and FOG.

The City Ordinance, section 18-404(2)(c), states, "Wastewater discharge permits are issued to a specified user for a specific operation. A wastewater discharge permit shall not be reassigned or transferred or sold to a new owner, new user,

-8-

different premises, or a new or changed operation without prior written authorization

from the city. Any succeeding owner or user shall also comply with the terms and

conditions of the existing permit." Section 18-403(2) subsections (q) and (t) define

BOD, TSS, and FOG as compatible pollutants and conventional pollutants. The

ordinance also defines industrial surcharge as "[a] cost recovery system establishing

a fee to be collected from industrial and commercial users that contribute excessive

amounts of compatible pollutants into the POTW."

On July 16, 2003, City Administrator James H. Crumley issued

"Amendments to Industrial User Permit No. 1017," which became effective July 15,

2003. Mr. Crumley's letter stated, "The enclosed pages should be replaced in your

permit accordingly." Part one, section A stated, "During the period of May 1, 2003

to May 1, 2007, the permittee is authorized to discharge process wastewater to the

City of Morristown sewer system from the below listed outfall(s)." These outfalls

included category 001. Section B stated, "During the period of July 15, 2003 to May

1, 2007, the discharge from outfall 001 shall not exceed the following effluent

limitations." The "Conventional Pollutants" category listed the same limitations for

BOD, TSS, and FOG as set in the original permit. The permit revision stated that all

three were "Subject to Surcharge Fee," not only in the heading of the Conventional

Pollutant category, but also beside the three pollutants–BOD, TSS, and FOG.

Finally, Appendix B stated the same formula and price per pound for BOD, TSS, and FOG as did the original permit. The original pages containing the above information are stamped "VOID."

On December 10, 2004, Koch Foods disclosed to the City via a letter to Veolia a wastewater pretreatment system description for Plant 2. The letter states:

> Please find the enclosed wastewater pretreatment system description for the new Koch Foods Debone Plant at 1620 Progress Parkway Morristown, TN. The descriptions of the systems operation and equipment specification sheets are enclosed for your review. I would like to request a meeting to discuss the specific details of the system start up and the timing of the relocation of the DAF [dissolved air flotation] unit from the existing plant to the new location. At this time I am not requesting any changes to our permits maximum daily flow parameter, but as we begin to ramp up production in the new facility we may need to request an increase in the daily flow limit. We will monitor our usages and address this if it will be necessary. . . .

On January 21, 2005, Morristown City Engineer Bryan Fowler sent a letter to Koch Foods. Mr. Fowler referred to the letter as an "Order," and the subject line read, "Compliance Order No. 05-001[;] Koch Foods, LLC, Plant No. 2[;] Industrial User Permit No. 1017." In the body of the letter, Mr. Fowler stated that the wastewater pretreatment description and drawings for Plant 2 were submitted to the City. The wastewater pretreatment description indicated that the DAF system from

-10-

Plant 1 would be relocated to Plant 2. In addition, a new self-cleaning rotary system would be installed. The letter "[a]ccordingly, . . . developed the Compliance Schedule," which the letter sets forth in detail, setting a schedule of activities to be accomplished prior to the beginning of production at Plant 2. Finally, the letter provided that the compliance dates could be extended for good cause and instructed Koch Foods how to seek an extension if needed.

On January 27, 2005, Koch Foods sought an extension of Compliance Order No. 05-001. The request explained that "[d]ue to some unforseen delays in electrical and equipment installation," Plant 1 would "shut down as of February 3, 2005," and production would start at Plant 2 "the following Monday." Mr. Fowler granted the extension via letter dated January 28, 2005.[4] The letter stated:

> This extension is being granted; however, due to the removal of the pretreatment system at Plant No. 2, the potential exists for high concentrations of BOD, FOG, and TSS. . . . Accordingly for the duration of the extension, Koch Foods, Plant No. 2 shall monitor outfall 001 for the following pollutants:
>
> 1. Biochemical Oxygen Demand (BOD)
> 2. Fats, Oils, and Grease (FOG)
> 3. Total Suspended Solids (TSS)
>
> In accordance with the terms of Industrial User

---

[4]The defendants claim that this letter, along with the January 21, 2005 letter, constitute "prior written authorization" required for the transfer of the permit to the Plant 2 location.

Permit No. 1017, Koch Foods, Plant No. 2 shall be subject to Surcharge Fees as specified in Appendix B of the permit.

In February 2005, Plant 2 began operations. The permit was again revised on November 29, 2005, to allow for an increase in the flow of discharge limits from 100,000 gallons per day to 175,000 gallons per day because of increased production at Plant 2.

On September 29, 2006, the City of Morristown received an "Industrial User Permit Application Form" from Koch Foods. The industry address was listed as "1620 Progress Parkway," the Plant 2 address. On April 27, 2007, City Administrator Crumley sent Koch Foods a letter which referenced "Reissuance of Industrial User Permit No. 1017." It further stated, "Your application for reissuance of your company's Industrial User Permit has been reviewed and processed in accordance with the City of Morristown Water Pollution Control Ordinance. Accordingly, the enclosed pages shall replace the correlating pages in Industrial User Permit No. 1017." The permit was effective from May 1, 2007, to May 1, 2010. The enclosed pages included the effluent limitation for BOD, TSS, and FOG, which were the same as they previously were. However, beside each pollutant it now states, "Concentration in Excess of Daily Maximum Subject to Surcharge Fee." All other pertinent provisions remain unchanged.

-12-

As stated, Plant 2 began operating in February, 2005 and began discharging wastewater into the Witt sewer line. Shortly after operations began at Plant 2, the plaintiffs allege that foul odors emanated from and continue to emanate from manholes and pump stations in the Witt and Roe Junction communities. The following chart illustrates plaintiffs' alleged violations where Koch Foods exceeded the pollutant limits set in the IU permit:

| DATE | BOD (Permit Level 250 MG/L) | TSS (Permit Level 250 MG/L) | pH (Permit Level 5.0 – 10.0) |
|------|------|------|------|
| 2/26/2005 | 570 | 264 | |
| 3/15/2005 | 496 | | |
| 4/6/2005 | 445 | | |
| 4/7/2005 | 424 | | |
| 5/4/2005 | 372 | | |
| 6/22/2005 | 600 | | |
| 7/29/2005 | 472 | | |
| 8/10/2005 | 288 | 328 | |
| 9/16/2005 | 407 | | |
| 9/21/2005 | 509 | 494 | |
| 9/27/2005 | 309 | | |
| 9/29/2005 | 562 | | |
| 10/5/2005 | 335 | | |
| 10/11/2005 | 286 | | |
| 10/25/2005 | 413 | | |
| 11/2/2005 | 417 | | |
| 11/8/2005 | 375 | | |
| 11/16/2005 | 468 | 268 | |
| 11/22/2005 | 380 | | |
| 11/30/2005 | 440 | | |
| 12/6/2005 | 408 | | |
| 12/20/2005 | 435 | 295 | |
| 12/28/2005 | 611 | | |
| 1/4/2006 | 515 | | |
| 1/10/2006 | 404 | | |
| 1/18/2006 | 342 | | |

| DATE | BOD (Permit Level 250 MG/L) | TSS (Permit Level 250 MG/L) | pH (Permit Level 5.0 – 10.0) |
| --- | --- | --- | --- |
| 2/1/2006 | 418 | | |
| 2/7/2006 | 524 | | |
| 2/9/2006 | 358 | | |
| 2/15/2006 | 338 | | |
| 2/21/2006 | 280 | | |
| 3/15/2006 | 416 | | |
| 3/21/2006 | 271 | | |
| 4/4/2006 | 434 | | |
| 4/12/2006 | 310 | | |
| 4/18/2006 | 640 | | |
| 5/2/2006 | 925 | | |
| 5/9/2006 | 414 | | |
| 5/23/2006 | 307 | | |
| 5/31/2006 | 358 | | |
| 6/6/2006 | 300 | | |
| 6/14/2006 | 308 | | |
| 6/20/2006 | 425 | | |
| 7/6/2006 | 369 | | |
| 7/11/2006 | 482 | | |
| 7/19/2006 | 394 | | |
| 7/24/2006 | 447 | | |
| 8/2/2006 | 363 | | |
| 8/16/2006 | 382 | | |
| 8/22/2006 | 474 | | |
| 8/24/2006 | 670 | | |
| 8/30/2006 | 478 | | |
| 9/6/2006 | 485 | | |
| 9/12/2006 | 509 | | |
| 9/20/2006 | 388 | | |
| 9/26/2006 | 471 | | |
| 10/4/2006 | 279 | | |
| 10/10/2006 | 300 | | |
| 10/17/2006 | 316 | | |
| 11/1/2006 | 383 | | 10.35 |
| 11/7/2006 | | | 10.31 |
| 11/15/2006 | 280 | | 11.11 |
| 11/21/2006 | 338 | | |
| 11/29/2006 | 299 | | |

-14-

| DATE | BOD (Permit Level 250 MG/L) | TSS (Permit Level 250 MG/L) | pH (Permit Level 5.0 – 10.0) |
|---|---|---|---|
| 12/5/2006 | 315 | | |
| 12/13/2006 | 301 | | |
| 12/19/2006 | 408 | | |
| 1/9/2007 | 374 | | |
| 1/18/2007 | 394 | | |
| 1/31/2007 | | | 10.81 |
| 2/14/2007 | 262 | | |
| 2/23/2007 | 356 | | |
| 2/28/2007 | | | 12.15 |
| 3/14/2007 | 253 | | |
| 3/19/2007 | | | 12.23 |
| 3/28/2007 | | | 11.68 |
| 4/18/2007 | 255 | | |
| 4/24/2007 | 272 | | |
| 5/8/2007 | | 4,644 | |
| 5/16/2007 | 410 | | |
| 5/22/2007 | 444 | 500 | |
| 5/30/2007 | | 13,967 | |
| 6/5/2007 | 596 | 1,072 | |
| 6/13/2007 | 430 | 304 | |
| 6/14/2007 | 458 | | |
| 6/14/2007 | 458 | | |
| 6/19/2007 | 592 | 288 | |
| 6/27/2007 | 488 | 948 | |
| 7/3/2007 | 662 | | |
| 7/11/2007 | 366 | | |
| 7/17/2007 | 446 | | |
| 7/25/2007 | 551 | 567 | |
| 7/31/2007 | 613 | | |
| 8/8/2007 | 627 | 881 | |
| 8/14/2007 | 546 | | |
| 8/15/2007 | 422 | 530 | |
| 8/22/2007 | 279 | 692 | |
| 8/28/2007 | 661 | 1,812 | |
| 9/4/2007 | 499 | 1,720 | |
| 9/11/2007 | 507 | 1,462 | |
| 9/19/2007 | 631 | 472 | |
| 9/25/2007 | 532 | 2,240 | |
| 10/3/2007 | 555 | 1,630 | |

| | | | |
|---|---|---|---|
| 10/9/2007 | 528 | | |
| 10/17/2007 | 420 | 5,125 | |
| 10/23/2007 | 602 | 1,477 | |
| 10/31/2007 | 637 | | 4.60 |
| 11/6/2007 | 726 | | |
| 11/14/2007 | 517 | | |
| 11/20/2007 | 484 | | |
| 11/28/2007 | 547 | | |
| 12/4/2007 | 537 | | |
| 12/12/2007 | 606 | | |
| 12/18/2007 | 313 | | |
| 12/27/2007 | 341 | | |
| 1/3/2008 | 468 | | |
| 1/16/2008 | 603 | | |
| 1/22/2008 | 421 | | 12.1 |
| 1/30/2008 | 488 | | |
| 2/5/2008 | 593 | | |
| 2/13/2008 | 375 | | |
| 2/14/2008 | 340 | | |
| 2/27/2008 | 458 (313 filtered) | | |
| 3/6/2008 | 664 (402 filtered) | | |
| 3/7/2008 | 312 | | |
| 3/11/2008 | 400 (369 filtered) | | |
| 3/19/2008 | 510 (472 filtered) | | |
| 3/25/2008 | 517 (465 filtered) | | |
| 4/2/2008 | 524 (475 filtered) | | |
| 4/8/2008 | 330 (310 filtered) | | |
| 4/16/2008 | 332 (293 filtered | | |
| 4/22/2008 | 353 (331 filtered) | | |
| 4/30/2008 | 308 (259 filtered) | | |
| 5/7/2008 | 279 (253 filtered) | | |
| 6/19/2008 | 274 (271 filtered) | | |
| 6/25/2008 | 312 (257 filtered) | | |
| 7/17/2008 | 417 (350 filtered) | | |
| 7/23/2008 | 390 (317 filtered) | | |
| 7/30/2008 | 426 (399 filtered) | | |
| 7/31/2008 | 270 | | |
| 8/6/2008 | 377 (320 filtered) | | |
| 8/14/2008 | 263 (138 filtered) | | |
| 8/20/2008 | 304 (231 filtered) | | |
| 8/28/2008 | 275 (171 filtered) | | |
| 9/25/2008 | 325 (268 filtered) | | |
| 11/12/2008 | 276 (192 filtered) | | |

| 1/22/2009 | 275 (246 filtered) |
| 1/28/2009 | 617 (226 filtered) |
| 2/11/2009 | 323 (237 filtered) |

The plaintiffs further allege that Koch Foods has not paid any fines or civil penalties for the excessive discharges. The City claims that it has assessed surcharges and that Koch Foods has paid those charges. In addition, the following is a list of actions taken by the City as a result of Koch Foods' discharges:

1.  September 27, 2005 - Notice of Violation Interference POTW and Issuance of Compliance Order 05-002;[5]

2.  July 18, 2006 - Notice of Violation of Compliance Order 05-002;

3.  November 10, 2006 - Notice of Administrative Hearing 06-001;

4.  December 20, 2006 - Issuance of Administrative Order 06-001;

5.  February 5, 2007 - Notice of Violation: pH violation 11-15-06;

6.  February 6, 2007 - Notice of Violation: Accidental Polymer Discharge 01-22-07;

7.  March 6, 2007 - Notice of Violation: pH violation 01-30-07;

8.  March 13, 2007 - Notice of Violation: pH violation 02-

---

[5]The plaintiffs contend that another Compliance Order, which set out a Compliance Schedule, was issued on November 29, 2005. The City argues that this was related to the September 27, 2005 Notice of Violation and separate Show Cause hearing.

28-07;

9.  April 3, 2007 - Notice of Violation: pH violation 03-19-07;

10.  April 4, 2007 - Notice of Violation: pH violation 03-28-07;

11.  April 27, 2007 - Compliance Schedule included in IU Permit 1017 effective May 1, 2007;

12.  December 31, 2007 - Notice of Violation: pH violation 10-31-07; and

13.  August 20, 2008 - Notice of Violation of Administrative Order 06-001 and Notice of Administrative Hearing 08-001.

The City has also reported 14 overflows on the Witt sewer line to TDEC

from July 9, 2005, to June 26, 2008.  These include:

1.  Dry weather overflow on the Witt 2 Lift Station on July 9, 2005 due to loss of control power;

2.  Dry weather overflow of the collection system at a manhole located near 2805 Sulphur Springs Road  on December 16, 2005, due to a leaking air release valve;

3.  Overflow of the collection system occurred at the inlet manhole to the Witt 3 Lift Station on July 13, 2006, due to loss of electrical power;

4.  Dry weather overflow of the collection system occurred at a manhole located at 1025 Sulphur Springs Road on August 31, 2006;

5.  A leak was observed at the Witt 2 Lift Station causing wastewater to be released intermittently on March 6, 2007;

6.  Power was interrupted at Witt 3 Lift Station located at Claude Collins Road on May 3, 2007 due to lightening damaged an electrical transformer.  It is estimated that 5,000 gallons bypassed the system;

7.  Dry weather overflow of the collection system occurred at the Witt 2 Lift Station on June 20, 2007;

8.  Dry weather overflow of the collection system occurred at the Witt 2 Lift Station on July 12, 2007, due to inoperable pump;

9.  Overflow on July 19, 2007 due to power outage at Witt 3 Lift Station;

10.  Overflow on August 2, 2007 due to power outage at Witt 3 Lift Station;

11.  Wet soils were discovered at 890 Old Witt Road directly west of Witt 2 Lift Station on January 7, 2008.  It was determined that the wastewater originated from the Witt 2 force main beneath Old Witt Road;

12.  Dry weather overflow of the collection system occurred at a clean out located at 2175 Sulphur Springs Road on January 11, 2008, due to an undetermined blockage;

13.  Overflow of the collection system occurred at the Witt 2 Lift Station on January 26, 2008; and

14.  Dry weather overflow of the collection system occurred at the Witt 2 lift station on June 26, 2008.

On March 20, 2007, the plaintiffs sent a Notice of Intent to File Citizen Suit under the Clean Water Act, 33 U.S.C. § 1365, to Koch Foods. Then on December 6, 2007, the plaintiffs sent a similar Notice of Intent to File Citizen Suit to the City. The notices allege that the violations have been occurring since Plant 2 commenced operation on February 7, 2005, and are continuing "as of the date of the [notice]" and "continuing at the present time." In addition, the plaintiffs attached a chart to their notice which detailed the dates that the effluent limitations were allegedly exceeded. [See Doc. 100-3]. There is no notice to Koch Foods purporting to identify any violations occurring after March 20, 2007. Furthermore, the notice to Koch Foods and the addendums do not specifically mention violations of pH levels or exceeding the 100,000 gallons per day flow limitation. The plaintiffs did, however, attach to the Koch Foods notice a September 27, 2005 Notice of Violation from the City to Koch Foods, which mentions flow in excess of 100,000 gallons per day, but not by reference to any specific date. As for the City's notice, the plaintiffs claim that the "Morristown pump station located on Claude Collins Road overflowed on April 14, 2007, and July 19, 2007 and may have overflowed at other times." The plaintiffs filed suit in this Court against Koch Foods on July 30, 2007, and against the City on March 28, 2008. This Court consolidated the cases on June 10, 2008.

## II.    STANDARD OF REVIEW

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.  56(c).  In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).  The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To refute such a showing, the non-moving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material factual dispute.  *Id.* at 322.  A  mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *McClain v. Ontario, Ltd.*, 244 F.3d 797, 800 (6th Cir. 2000).  This Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party.

*Anderson*, 477 U.S. at 248-49; *Nat'l Satellite Sports*, 253 F.3d at 907. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. If this Court concludes that a fair-minded jury could not return a verdict in favor of the non-moving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

The party opposing a Rule 56 motion may not simply rest on the mere allegations or denials contained in the party's pleadings. *Anderson*, 477 U.S. at 256. Instead, an opposing party must affirmatively present competent evidence sufficient to establish a genuine issue of material fact necessitating the trial of that issue. *Id.* Merely alleging that a factual dispute exists cannot defeat a properly supported motion for summary judgment. *Id.* A genuine issue for trial is not established by evidence that is "merely colorable," or by factual disputes that are irrelevant or unnecessary. *Id.* at 248-52.

## III.  **FEDERAL CLEAN WATER ACT CLAIMS**

In passing the CWA, Congress established a comprehensive regulatory scheme to control the discharge of waste and pollutants into the nation's navigable waters. The CWA's objective is to "restore and maintain the chemical, physical, and

-22-

biological integrity of the Nation's waters." 33 U.S.C. § 1251. The CWA makes

unlawful any pollutant discharges into navigable waters, except as authorized by

other provisions of the CWA, §§ 1311(a), 1342, and requires the promulgation of

effluent limitations which set the maximum allowable quantities, rates and

concentrations of different pollutants that may be discharged into waters. § 1362(11).

"The term 'discharge of a pollutant'" means "any addition of any pollutant to

navigable waters from any point source,"§ 1362(12), and "pollutant" includes

"dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge,

munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked

or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and

agricultural waste discharged into water," § 1362(6). "The term 'point source' means

any discernible, confined and discrete conveyance, including but not limited to any

pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock,

concentrated animal feeding operation, or vessel or other floating craft, from which

pollutants are or may be discharged." § 1362(14). Finally, "'navigable waters'

means the waters of the United States, including territorial seas." § 1362(7).

The EPA enforces the CWA through the NPDES, under which the EPA

has the discretion to issue permits, or delegate that power to states, for the discharge

of otherwise prohibited effluents, after a public hearing and subject to conditions set

by the EPA. § 1342(a)(1). More specifically, section 1317 establishes the federal pretreatment program for regulation of discharges from industrial facilities into publicly owned treatments works ("POTW"), and subsection (d) prohibits the operation of any source of discharge of pollutants into a POTW in violation of prohibitions on discharges or pretreatment standards or effluent limitations. § 1317. Certain pretreatment standards for industrial users have been adopted by the EPA. *See* 40 C.F.R. § 403 (2009).

Section 1342(b) authorizes states to implement the permitting programs of the CWA, including pretreatment programs for discharges by industrial users into POTWs. 33 U.S.C. § 1342(b). The State of Tennessee, through the Tennessee Water Quality Control Act ("TWQCA"), has done just this, and the program mirrors the EPA program. *See* Tenn. Code Ann. §§ 69-3-101 *et seq*. Moreover, the TDEC has established certain rules and regulations. The TDEC rules prohibit discharges of certain pollutants into a POTW, and the specific prohibitions are listed in Title 40 Code of Federal Regulations section 403.5. *See* 40 C.F.R. § 403.5(b). Thus, pursuant to the CWA, TWQCA, and TDEC regulations, cities, such as the City of Morristown, adopt ordinances which enable them to comply with all applicable state and federal laws. In so doing, the cities regulate industrial discharges and issue industrial user permits.

-24-

While the EPA and states generally enforce the CWA, private citizens may also enforce the CWA: "[A]ny citizen may commence a civil action on his own behalf . . . against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation under this chapter  . . . ." 33 U.S.C. § 1365(a).  The CWA defines "citizen" as "a person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(g).  "Effluent standard or limitation" includes "prohibition, effluent standard or pretreatment standards under section 1317 of this title." 33 U.S.C. § 1365(f)(4).  Further, under the citizen suit provision, "effluent standard or limitation" includes "a permit or condition thereof issued under section 1342 [the NPDES permitting regime]." 33 U.S.C. § 1365(f)(6).

## A.    WHETHER THERE IS FEDERAL JURISDICTION?

Both defendants claim that this Court lacks jurisdiction for two reasons, lack of adequate notice and standing.  *See* Fed. R. Civ. P. 12(b)(1).  The plaintiffs, however, contend that both arguments lack merit.  This Court must consider these two jurisdictional issues before considering the parties' motions on the merits.[6]

---

[6]In a supplemental brief, the plaintiffs argue that a Commissioner's Order from TDEC, received by the City on September 14, 2009, is substantive evidence that alleged overflows constitute violations of the City's NPDES permit.  In response, the City argues that the Order requires the City to take certain actions to remedy any overflow problems.  The City claims that the Order addresses the same concerns raised by the plaintiffs in their complaint.  The City is correct that in certain situations this can render the citizen suit moot.  *See Ailor v. City of Maynardville, Tennessee*, 368 F.3d 587, 599-601 (6th Cir. 2004).  However, it would not render the issue moot here because the Order was filed after the citizen suit, and the City indicated in its

## 1. Standing

The City argues that the plaintiffs lack standing because they have failed to allege a specific interest in an affected body of navigable water. In their response to plaintiffs' motion for summary judgment, the City somewhat alters its argument and contends that the plaintiffs alleged injury "is not within the zone of interest to be protected by the Clean Water Act and their alleged injury will not be redressed by a favorable judgment." Similarly, Koch Foods argues that the plaintiffs lack standing "because their alleged injury is not within the zone of interests to be protected by the CWA"–i.e., their interests relate solely to their interests in land, not waters.[7] It also alleges the plaintiffs lack standing "because their alleged injury will not be redressed by a favorable judgment."[8]

---

response that it intends to appeal the Order. Thus, the City cannot establish that the challenged conduct cannot reasonably be expected to start up again. *Ailor*, 368 F.3d at 600 (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181-82 (2000)). Furthermore, a proceeding before TDEC is not "court enforcement" for purposes of sections 1319(a) and 1365(b), *id*. at 591 (citing *Jones v. City of Lakeland*, 224 F.3d 518 (6th Cir. 2000) (en banc); thus, the Order does not preclude the citizen suit.

[7]Koch Foods does not distinguish between the plaintiffs claims of discharges placed directly into to sewer system and claims of runoff wastewater from trucks.

[8]Regarding their zone-of-interests argument, Koch Foods stated in its reply that "it is true that [the zone of interests test] is generally applied as part of the statutory standing or prudential considerations analysis, not Article III. *Bennett v. Spear*, 520 U.S. 154 (1997)[. *B*]*ut see American Canoe Assn. v. District of Columbia Water and Sewer Auth.*, 306 F.Supp.2d 30 (D.D.C. 2004). While Koch does not concede that the Plaintiffs will be able to make the required Article III injury-in-fact showing at trial–as they must–the issue of injury in fact is probably not ripe for summary judgment."

-26-

In response to the City's arguments, the plaintiffs argue that they "do not have to show any specific interest in any navigable water to have standing to pursue their CWA claims" and that they "have Article III standing under the CWA to enforce any and all conditions of an NPDES Permit." In response to both the City and Koch Foods' arguments, the plaintiffs argue that the zone of interest test does not apply to citizen suits under the CWA, and even if it did, the injuries fall within the zone of interests. Finally, the plaintiffs argue that their injuries may be redressed by this CWA action.

"[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181-82 (2000). "The relevant showing for purposes of Article III standing, however, is not injury to the environment but injury to the plaintiff." *Id*. at 181. In addition to meeting the constitutional minimum requirements, the plaintiffs must also satisfy any statutory requirements for standing before bringing suit.

As stated above, "[A]ny citizen may commence a civil action on his own

-27-

behalf . . . against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation under this chapter  . . . ." 33 U.S.C. § 1365(a).  The CWA defines "citizen" as "a person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(g).  "Effluent standard or limitation" includes "prohibition, effluent standard or pretreatment standards under section 1317 of this title." 33 U.S.C. § 1365(f)(4).  Further, under the citizen suit provision, "effluent standard or limitation" includes "a permit or condition thereof issued under section 1342 [the NPDES permitting regime]." 33 U.S.C. § 1365(f)(6).  Congress has indicated that subsection (g), which defines "citizen," confers standing to enforce the Clean Water Act to the full extent allowed by the Constitution.  *See Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 16 (1981) (citing *Sierra Club v. Morton*, 405 U.S. 727 (1972)).  "Thus, if a [CWA] plaintiff meets the constitutional requirements for standing, then he *ipso facto* satisfies the statutory threshold as well." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 155 (4th Cir. 2000).

First, this Court will address the City's argument that the plaintiffs lack standing because they have failed to allege a specific interest in an affected body of navigable water.  The City essentially argues that plaintiffs have not alleged a specific interest in navigable waters because they only allege discharges into the sewer

system, which does not constitute navigable water pursuant to *United States v. Rapanos*, 547 U.S. 715 (2006).  It is true that *Rapanos* states in dicta that sewage pipes and systems "likely do not qualify as 'waters of the United States,' despite the fact that they may contain continuous flows of water."  *Id.* at 736 n. 7.  However, *Rapanos* also states that, "[t]he Act does not forbid the 'addition of any pollutant *directly* to navigable waters from any point source,' but rather the 'addition of any pollutant *to* navigable waters.'"  *Id.* at 743.  Furthermore, the Supreme Court cites a Tennessee district court case, *United States v. Velsicol Chemical Corp.*, 438 F.Supp. 945, 946-47 (W.D. Tenn. 1976), in support of this contention.  That case states that the defendant's discharge into the sewer system–i.e., the point source, which ultimately led to navigable water, sufficiently "satisf[ied] the requirements of discharging into 'waters of the United States.'"  *Id.*  More importantly, however, this issue is more appropriately one on the merits and not one of jurisdiction.  *See Sierra Club v. City and County of Honolulu*, CV. No. 04-00463 DAE-BMK, 2008 WL 3850495, at *3-4 (D. Hawaii Aug. 18, 2008).[9]

Second, this Court must decide whether the plaintiffs have Article III standing under the CWA to enforce any and all conditions of an NPDES permit, thus

---

[9]"To establish a violation of the CWA, a plaintiff must show that defendants (1) discharged (2) a pollutant (3) to navigable waters (4) from a point source. *See Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 532 (6th Cir. 2001).

-29-

obviating the need for plaintiffs to show a specific interest in any navigable water, at least for standing purposes regarding alleged violations of an NPDES permit.[10] "Under § 505(a) of the Act, a suit to enforce *any limitation* in an NPDES permit may be brought by any 'citizen,' defined as 'a person or persons having an interest which is or may be adversely affected.'" *Laidlaw*, 528 U.S. at 174 (emphasis added). Several other courts have held that plaintiffs have standing by alleging a violation of any NPDES permit condition. *See American Canoe Assoc., Inc. v. District of Columbia Water and Sewage Auth.*, 306 F.Supp.2d 30, 36 (D. D.C. 2004) (finding that plaintiffs had standing because the CWA "allows citizen suits to enforce any NPDES permit provision"); *Gaston Copper*, 204 F.3d 149, 152 (4th Cir. 2000) (*en banc*) (finding that 33 U.S.C. § 1365(f) allows citizen suits for "any term or condition of an approved [NPDES] permit"); *Northwest Envtl. Advocates v. City of Portland*, 56 F.3d 979, 986 (9th Cir. 1995) ("The plain language of [§ 1365] authorizes citizens to enforce all permit conditions"); *see also City and County of Honolulu*, 2008 WL

---

[10]The plaintiffs only make this argument in response to the City's standing arguments. This Court infers that the plaintiffs assert that standing exists merely by alleging a specific violation of the CWA, even when no violation of the NPDES permit is alleged. However, this Court need not decide that issue because in all CWA counts against the City, the plaintiffs have alleged violations of the NPDES permit. When the plaintiffs allege a violation of the CWA without a specific reference to a violation of the NPDES permit condition, it is only in relation to Koch Foods. Koch Foods neither moves for summary judgment on this particular ground nor responds to this particular argument in any of its filings. It seeks summary judgment only as to the third prong, redressability.

3850495, at *16-18 (stating ground-only spill was a violation of the NPDES permit condition although it did not relate to navigable water and was thus enforceable citizen suit); *Conn. Fund for Env't v. Raymark Indus., Inc.*, 631 F. Supp. 1283, 1285 (D.Conn. 1986) (Cabranes, J.) ("There is nothing in the language or legislative history of the [CWA] to suggest that a citizens' suit may seek to enforce only those conditions of an NPDES permit that regulate the quality of a discharge immediately before its release into navigable waters."); *Locust Lane v. Swatara Township Auth.*, 636 F. Supp. 534, 537-38 (M.D.Pa. 1986) (holding that plaintiffs had standing to enforce permit provision that set a schedule for the construction of wastewater treatment facilities); *Pymatuning Water Shed Citizens for a Hygienic Env't v. Eaton*, 506 F. Supp. 902, 908 (W.D.Pa. 1980) ("Inasmuch as we have found violations of the NPDES permit it is unnecessary to determine whether plaintiffs have proved violations of effluent standards or limitations under . . . 33 U.S.C. § 1311 or any other section of the Clean Water Act.").

The parties fail to cite, and this Court has not found, a Sixth Circuit case which speaks to this precise issue. Therefore, based mainly upon the plain language of the statute, but also upon other courts' opinions interpreting the language of the CWA, this Court FINDS that the plaintiffs have standing to sue based upon allegations of specific NPDES permit violations. This Court notes that this result is

somewhat unusual, considering that practically anyone could file suit for a violation of an NPDES permit, without any relation to the area affected, albeit land or water. *See City and County of Honolulu*, 2008 WL 3850495, at * 17 (discussing how its finding of violations of the permit is in effect a finding of violations of the CWA "that are not based on adding pollutants to waters of the United States" may seem like "a flawed result"). Nonetheless, the plain language of the statute seems to mandate this result. However, because the Sixth Circuit has not spoken on the issue, this Court will address all claims in terms of specific factors required under Article III below.

Third, it seems that Koch Foods has abandoned its zone-of-interests argument. In addition, the City has cited no authority stating that this Court must apply that test to this citizen suit. Therefore, this Court declines to apply the zone of interest test and will address the issue from an Article III standpoint as the Supreme Court has done for citizen suits under the CWA. *See Laidlaw*, 528 U.S. 181-82.

Fourth, regarding the Article III standing requirements, this Court will first address the injury-in-fact prong. Koch Foods conceded that this issue was not ripe for summary judgment, and this Court agrees. As to the element of redressability, the plaintiffs must show that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Laidlaw*, 528 U.S. at 181-82. Defendant Koch Foods argues that the plaintiffs' expert, Dr.

Christopher Cox, testified that even if Koch Foods were in strict compliance with all numerical limits of its IU permit, there would still be odors in the Morristown sewer system; thus, plaintiffs have failed to meet the redressability test. The City argues for the first time in its response to plaintiffs' motion for summary judgment that the "alleged injury will not be redressed by a favorable judgment." The City, however, does not develop the argument beyond this generalized allegation, and appears to be merely parroting Koch Foods' argument.

The plaintiffs argue that the City's permit requires the City to properly operate and maintain the sewer system and to implement and enforce industrial pretreatment programs. In addition, the permit prohibits overflows of the sewer system. Therefore, the plaintiffs contend that an injunction forcing the City to comply with the terms of the permit would redress plaintiffs' injuries, including "stopping Koch Foods' industrial discharges." Also, the plaintiffs argue that civil penalties under the CWA provide sufficient deterrence to support Article III's redressability requirements. *See Laidlaw*, 528 U.S. at 187-88. Regarding Koch Foods' argument, the plaintiffs contend that the IU permit contains provisions that prohibit the discharge of pollutants containing malodorous gases and compounds known to cause odors causing a public nuisance and prohibits the discharge of pollutants that interfere with the sewer system. The plaintiffs claim that an injunction

enforcing these provisions would redress their injuries. Also, they argue that they need not show that a favorable result will relieve every injury. *Massachusetts v. E.P.A.*, 549 U.S. 497, 525 (2007) (citing *Larson v. Valente*, 456 U.S. 228, 244 n. 15 (1982).

It is true that Dr. Cox's opinion states that the odors are "likely to persist until the TKN [total kjeldahl nitrogen] levels are significantly reduced or until the wastewater from Koch Foods no longer has to travel through a force main system characterized by long retention times." He also suggests additional treatment of Koch Foods' effluent to remove the TKN and to reliably meet the BOD and TSS limits in order to "eliminate this problem." Dr. Cox states that the removal of the nitrogen "cannot be guaranteed to eliminate the odors" because of the actual condition of the Witt sewer system but offers a way to "greatly decrease[]" the odor. Thus, it is clear that enforcement of the effluent limitations would remedy the odor problem in large part. An injunction would provide this remedy. As the plaintiffs have also stated, civil penalties provide sufficient deterrence to support Article III's redressability requirement, *Laidlaw,* 528 U.S. at 187-88. In addition, they need only show that a favorable decision will relieve a discrete injury to themselves, and they need not show that a favorable decision will relieve every injury. *Massachusetts*, 549 U.S. at 525. This Court FINDS, therefore, that the plaintiffs' injuries would be redressed by the

relief sought–i.e., injunction and civil penalties–even though there exists a possibility that all odor problems may not be completely eliminated.

In sum, this Court FINDS that the plaintiffs have standing for all of their claims against both defendants.

### 2. Notice

The CWA's citizen suit provision requires that a plaintiff provide notice to alleged violators of the Act and provide them 60 days to respond before bringing suit. 33 U.S.C. § 1365(b). Federal regulations require that the notice letter include certain items, including "sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice." 40 C.F.R. § 135.3(a). Strict compliance with this provision is a mandatory jurisdictional prerequisite for a citizen suit. *Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, 175 F.Supp.2d 1071, 1077 (E.D. Tenn. 2001) (citing *Greene v. Reilly*, 956 F.2d 593, 594 (6th Cir. 1992)); *see also Walls v. Waste Res. Corp.*, 761 F.2d 311, 316 (6th Cir. 1985) (holding that compliance with the sixty day notice requirement of the Resource Conservation and Recovery Act is a jurisdictional prerequisite).

The policy considerations behind the notice requirement were discussed in *Frilling v. Village of Anna*, 924 F.Supp. 821, 833-34 (S.D. Ohio 1996). Chief United States District Judge Rice, in his opinion in that case, stated:

> [T]here are compelling policy reasons for holding that plaintiffs bringing suit under the Clean Water Act must identify the *specific* standard(s), limitation(s), or order(s) which are alleged to have been violated. . . . [F]*irst*, such specific notice will allow the government agencies to evaluate fully and adequately the violations alleged, and thereby to determine accurately their appropriate level of involvement in the matter; *second*, such specific notice will allow the recipient an opportunity to cure the violations before suit is brought, which may obviate the need for a costly lawsuit.

*Id*.

Initially, Defendant Koch Foods argued in its motion for partial summary judgment that the plaintiffs' March 20, 2007 notice[11] did not meet the notice requirements because it was "silent as to the date or date[s] of the alleged violations." Koch Foods also asserted that plaintiffs' notice was deficient because plaintiffs "do not provide a specific number of violations over a given period of time, nor do they allege that the violations were' intermittent,' 'continuing,' or 'nearly daily.'" Then, however, after the filing of plaintiffs' response and plaintiffs' own motion for

_____

[11]The plaintiffs sent addendum notices on March 30, 2007, July 31, 2007 and January 17, 2008, but none of the addendums alleged more violations. The addendums simply added new plaintiffs.

summary judgment, and the filing, for the first time, of four (4) attachments to plaintiffs' March 20 notice, Koch Foods largely abandoned its argument and acknowledged that the filing of the attachments resolved "some but not all" of the alleged deficiencies in plaintiffs' notice. In plaintiffs' motion for summary judgment, they argue that Koch Foods' violations of the effluent limitations of its IU permits caused interference problems and exceeded the BOD, TSS, and pH limits, as well as the gallon-per-day flow limit. Koch Foods now limits its argument that the notice requirements were not met to the alleged violations of pH limits and flow in excess of 100,000 gallons per day which, they assert, were not mentioned in the March 20 letter and its attachments.[12] Also, while acknowledging that the notice has specific interference, odor, BOD and TSS allegations, Koch Foods contends the notice is deficient as to any similar allegations not specifically mentioned and any alleged violations, regardless of the particular pollutant, which occurred after the March 20, 2007 notice.

The plaintiffs respond that they have complied with the notice requirements, for their notice referenced pH and flow problems. Such references, they argue first, meet the specificity requirements. In addition, they contend that they

---

[12] Koch Foods also notes that neither the original, First Amended, nor Second Amended complaints contain any allegations of violations of the pH limit or the gallon-per-day flow limit.

"are entitled to prove additional violations of the same type on summary judgment or at trial without having to include them in additional 60-day notice letters as the violations recur or are discovered."  In support of this contention, the plaintiffs rely on a Third Circuit case, *Public Interest Research Group of New Jersey v. Hercules, Inc.*, 50 F.3d 1239 (3rd Cir. 1995).

This Court FINDS that the notice is not specific as to exceeding pH and flow limitations.  Neither the notice nor attachments lists pH anywhere in the documents.  While the notice does refer generally to alleged violations of effluent limitations, it does not mention pH specifically.  Furthermore, it does not mention a date when the alleged pH violations occurred.  In addition, the complaint does not allege a violation regarding pH.

This circuit requires strict compliance with notice requirements.  *See Nat'l Parks*, 175 F.Supp.2d at 1077; *see also Hallstrom v. Tillamook*, 493 U.S. 20, 31 (1989);  *American Canoe Assoc., Inc. v. District of Columbia Water and Sewage Auth.*, 306 F.Supp.2d 30, 36 (D. D.C. 2004) ("Notice is not proper if the letter generally alleges illegal discharges without naming specific substances.").  Also, there is no specific mention of a flow limitation violation nor a date on which it occurred.  It is true that the letter mentions flow, but these references are always related to interference, especially regarding BOD.  Additionally, the September 27,

2005 Notice of Violation, which was attached as an exhibit to the notice, states that Koch Foods had exceeded its discharge limit of 100,000 gallons per day and that the permit would be changed to allow for 175,000 gallons per day. Nonetheless, this is the only reference to actually exceeding the 100,000 gallon per day limit, and it does not meet the specificity requirements of this circuit. Finally, the complaint fails to allege a violation for exceeding the 100,000 gallon per day limit as well.

As to the alleged effluent violations after March 20, 2007, the date of the notice letter, no notice has been given as to those alleged violations. The March 20 notice stated that the "violations have been continuous since the beginning of operations [of Plant 2] and continue to the date of this letter." In addition, the second amended complaint, which was filed much later than the notice letter, does not allege any specific dates. It merely asserts that "each violation identified in the Notice which was marked as 'continuing' was also continuing as of the date that this Second Amended Complaint was filed." Merely alleging that a violation is "continuing" is not sufficient notice. *See Nat'l Parks*, 175 F.Supp.2d at 1077 (holding that notice was not specific to meet jurisdictional requirements when notice merely stated that a defendant "'regularly violated' the standard 'for at least five years'"). Thus, this Court lacks jurisdiction as to those alleged violations as well. *See Atlantic States Legal Found. v. United Musical Intruments, U.S.A.*, 61 F.3d 473, 478 (6th Cir. 1995)

(holding that jurisdictional notice requirements not met as to those occurring in 1991 when notice alleged violations from 1987-1990 and complaint listed 1988-1991).

The plaintiffs also argue, pursuant to *Hercules*, 50 F.3d at 1250, that they "are entitled to prove additional violations of the same type on summary judgment or at trial without having to include them in additional 60-day notice letters as the violations recur or are discovered." While this is indeed the rule in the Third Circuit, it is not the law of the Sixth. Judge Rice specifically rejected *Hercules'* reasoning in *Frilling*, 924 F.Supp. at 833, finding the Sixth Circuit's holding in *United States Musical Instruments*[13] to be dispositive. This Court agrees. This Court does note, however, that in dicta, the Sixth Circuit has stated, "It may be true that private plaintiffs need not send additional notice letters for violations of the 'same type' once they have filed a complaint." *See Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 478 (6th Cir. 2004); *see also Sierra Club v. Hamilton County Board of County Commissioners*, 504 F.3d 634, 644 (6th Cir. 2007) (mentioning the district court's conclusion that notice was sufficient because the violations were "closely related"; however, the issue on appeal was whether the district court erred in awarding attorneys' fees). Nonetheless, as with the District Court in *Frilling*, this Court will follow Sixth Circuit

---

[13] *United States Musical Instruments* involved the notice provision of the Emergency Planning and Community Right-to-Know Act, which is identical to the one found in the CWA.

precedent, which mandates strict compliance, and not dicta.[14]

Similar to Koch Foods' arguments, the City claims in its response to the plaintiffs' motion for summary judgment that the plaintiffs failed to meet the notice requirements regarding certain alleged overflows and that this Court only has jurisdiction over the two overflows listed in the December 6, 2007 notice.[15] These overflows allegedly occurred on April 14, 2007, and July 19, 2007. Plaintiffs have moved for summary judgment based on a total of 14 alleged overflows, which are listed above. The April 14, 2007, overflow is not addressed in the plaintiffs' statement of undisputed material facts and the City claims no record of an overflow on that date. The City disputes the January 26, 2008 overflow and the plaintiffs agree that the City has not reported an overflow on this date to TDEC. However, in their reply, plaintiffs seek to add an overflow which allegedly occurred on August 28, 2008, in the January 26, 2008 overflow's stead.

Again, the plaintiffs argue that the notice provided "ample specificity"

---

[14]Even if the reasoning in *Hercules* applied in this case, to be the "same type" the violations must be the "same parameter, same outfall." Here, pH and 100,000 gallon per day flow are different parameters than those listed in the notice. As to the violations occurring after March 20, 2007, which relate to interference, BOD, and TSS, it would be a closer call.

[15]The City does not argue in its motion for summary judgment that this court lacks jurisdiction because of the plaintiffs' failure to adhere to the notice requirements. The City raised this argument for the first time in its response to plaintiffs' motion. Although not properly raised, the Court will decide the issue.

-41-

regarding the 14 overflows. In addition, the plaintiffs rely on *Hercules* in arguing that "as long as additional pre-complaint or post-complaint violations are of the same type as a violation included in the 60-day notice letter, no new 60-day notice letter is necessary to prosecute these violations in the suit."

For the same reasons set forth above, this Court FINDS that the notice is not specific as to the 13 overflows not listed in plaintiffs' December 6 notice. The notice states, "On at least two occasions, April 14, 2007[,] and July 19, 2007, Morristown violated 33 U.S.C. [§] 1311(a) and Tenn. Code Ann. § 69-3-108 by discharging untreated sewage from the pump station located on Claude Collins Road in Hamblen County, onto neighboring properties and into a nearby creek." None of the other alleged overflows are contained in the notice, and no others are listed in the complaint. Furthermore, it is unclear whether the overflows are alleged to have taken place at the same pump station. This Court discerns that some are not. Moreover, no dates are listed for the other overflows, for they simply do not appear in the notice. This is not sufficient to meet the jurisdictional notice requirements. *See Sierra Club Ohio Chapter v. City of Columbus*, 282 F.Supp.2d 756, 769(S.D. Ohio 2003) (holding notice insufficient where it failed to specify the activity alleged to constitute a violation and the specific date(s) and location(s) of alleged overflows). Also, for the same reasons as above, this Court declines to follow the Third Circuit in finding that

-42-

these violations are of the same type so that no new notice is required.

In sum, this Court holds that it lacks subject matter jurisdiction over claims against Koch Foods for any allegation of exceeding the limits for pH and 100,000 gallon per day flow. It also lacks subject matter jurisdiction for any alleged violations occurring after March 20, 2007. As to the City, this Court lacks subject matter jurisdiction over all overflows except the July 19, 2007 overflow.[16]

## B.  WHETHER DEFENDANT KOCH FOODS VIOLATED THE CWA?

The plaintiffs allege in their complaint that the IU permit No. 1017 "does not cover the operation of [Plant 2]." Koch Foods moves for summary judgment on this issue, arguing that there is no genuine issue of material fact that the transfer of the IU permit from the 4901 East Morris Boulevard location to Plant 2 was valid. In addition, they move for summary judgment on the grounds that the Plant 2 permit was

_____

[16]The United States Magistrate Judge addressed the admissibility at trial of the overflows over which this Court does not have jurisdiction in his Order denying the City's motion in limine. *See* [Doc. 171]. More specifically, the Order stated:

 "[E]vidence of other overflows not described in plaintiffs' 60-Day Notice is admissible against the co-defendant Koch Foods with reference to the various common law claims asserted by the plaintiffs against Koch. However, that basis for admitting evidence of other overflows against Koch will not support admissibility of such evidence against the City of Morristown if the district judge sustains Morristown's motion for summary judgment with regard to the common law actions asserted against it. Nevertheless, to repeat, evidence of other overflows is admissible against the City of Morristown under the Clean Water Act claim even if the district judge sustains Morristown's motion for partial summary judgment on the various common law causes of action."

renewed in a timely fashion. This Court agrees that there is no genuine issue of material fact as to both issues.

At the outset, this Court must address Koch Foods' claim that the plaintiffs' notices did not allege that the 2003 permit expired prior to transfer, and thus, this Court lacks subject matter jurisdiction over such a claim. Koch Foods did not raise this argument alongside its other notice arguments but discusses it in a different section of its brief. For the same reasons set forth above regarding the other notice arguments, this Court FINDS that the plaintiffs did not put Koch Foods on notice to this allegation and the Court lacks subject matter jurisdiction on the issue. Nonetheless, this Court will briefly address the merits of the issue.

As stated above, permits may be transferred under the City ordinance to "different premises" upon "prior written authorization." The Plant 1 permit was set to expire on May 1, 2005.[17] On December 10, 2004, Koch Foods sent a letter to Veolia, and it "enclosed wastewater pretreatment system description for the new Koch Foods Debone Plant" and a request to relocate the DAF system. On January 21, 2005, the City Engineer responded that the City had received the pretreatment plans and drawings, and the letter developed a Compliance Schedule to be complied with

---

[17] On July 16, 2003, the City had amended the IU permit and extended the expiration date to May 1, 2007.

prior to the beginning of production at Plant 2. The subject of the letter included

Plant 2 and reference to the IU permit number. Per instructions in the January 21,

2005, Compliance Order, Koch Foods sought an extension of the Compliance

Schedule. It also informed the City that Plant 1 would shut down as of February 3,

2005, and Plant 2 would start production "the following Monday." Operations began

in February 2005.

The permit was revised on November 29, 2005, and the effective dates

remained unchanged. This Court notes that the City's revisions to the permit would

have been completely pointless if the permit had not been properly transferred to the

Plant 2 location. On September 29, 2006, the City received an "Industrial User

Permit Application Form" from Plant 2. In response, the City sent Koch Foods a

letter, and the subject line read "Reissuance of Industrial User Permit No. 1017."

The City enclosed pages to replace "correlating pages in Industrial User Permit No.

1017." It also extended the effective dates from May 1, 2007, to May 1, 2010. The

declarations of Cindy Krebs, Veolia's project manager and Barry Calfee, then-

director of Morristown's pretreatment program, confirm these facts. The plaintiffs

offer no evidence to dispute these facts. They merely argue that pages on the July

2003 amendment, which extended the effective dates, are stamped "void." While this

is true, the declarations of Kreb and Calfee explain the notation. Plaintiffs have not

submitted an affidavit or testimony contradicting these sworn statements. As such, the conclusory claim that the pages are void is not enough to create an issue of material fact.

Koch Foods also argues that it is entitled to summary judgment because the "exceedances [of the BOD and TSS limits] are not a violation of the Industrial User Pretreatment Permit." Koch Foods relies upon the declarations of Krebs and Calfee, along with the deposition of David Wilds, in supporting its contention. It further claims that the permit and the city ordinance allow the City to charge them surcharges for any exceedances, and they have been charged and have paid these surcharges.

The plaintiffs respond to the contrary, claiming that the language of the permit is unambiguous and that Koch Foods "shall not" exceed the limit "by any magnitude." The plaintiffs rely on many clauses in the permit to support their contention, and those clauses are set forth above. Koch Foods counters and states that "[o]ne of the primary points of contention between the parties is whether the 250 mg/l numeric limit in Koch's industrial user permit No. 1017 is a surcharge level triggering additional user fees or a permit ceiling triggering up to $32,500 per day in civil penalties." It also contends, however, that the permit language is unambiguous.

This is the main issue to decide, for depending upon the answer to this

-46-

question, the permit could be interpreted different ways. In that regard, the permit states:

> The City may accept waste for treatment at the POTW that contains excessive quantities of compatible pollutants. In the event the City elects to accept such waste for treatment, a surcharge shall be charged based upon the strength of the discharge up to the maximum levels established herein. Wastes that exceed the maximum levels established herein shall be deemed noncompatible, and shall not be accepted for treatment by the POTW except as specified herein. The surcharge for compatible pollutants shall be calculated as established in Appendix B "Surcharge Fees."

The permit is silent as to what constitutes the "maximum levels." Thus, there exists an issue of fact. Koch Foods argues that even if the language of the permit is ambiguous on this point, which it clearly is, then the City's interpretation is entitled to deference. *See Russian River Watershed Protection Committee v. City of Santa Rosa*, 142 F.3d 1136, 1141 (9th Cir. 1998); *Natural Resources Defense Council, Inc., v. Texaco Refining & Marketing, Inc.*, 20 F.Supp.2d 700, 711 (D. Del. 1998). Koch Foods has not cited any Sixth Circuit authority to support it contention. Thus, this Court views the matter as an issue of fact for trial.

The plaintiffs claim that they are entitled to summary judgment because Koch Foods has repeatedly violated the general prohibitive standards in the IU permit. These standards are listed above. The plaintiffs support this contention with

the notice of violations which the City sent to Koch Foods and with Dr. Cox's opinions. Koch Foods responds that the CWA "does not envision liability without causation for indirect dischargers." *See National Ass'n of Metal Finishers v. E.P.A.* 719 F.2d 624 (3rd Cir. 1983), *rev'd on other grounds*, *Chemical Mrs. Ass'n v. Natural Resources Defense Council, Inc.*, 470 U.S. 116 (1985); *E.P.A. v. City of Forest Green*, 921 F.2d 1394, 1406-07 (8th Cir. 1990). The general pretreatment standards prohibit discharges which "cause Interference." 40 C.F.R. § 403.5(a)(1). Therefore, Koch Foods argues, that the indirect discharger must cause the "Interference" before it can be held liable to have violated the general pretreatment standards. *See id*. at 641. Koch Foods also argues that the plaintiffs have presented evidence that only one plaintiff, Plaintiff Stephens, is affected by the alleged odors. It contends that when some of its witnesses visited the area, no odors were detected. It further argues that there are other sources in the area which could be the cause of the odors. Quite simply, there is an issue of fact as to this claim.

## C. WHETHER DEFENDANT CITY OF MORRISTOWN VIOLATED THE CWA?

The City moves for summary judgment on the CWA claim regarding the overflow which allegedly occurred July 19, 2007.[18] The City contends that the

---

[18]Because of the plaintiffs' failure to provide adequate notice, this is the only overflow for which this Court has jurisdiction.

overflow constituted an upset pursuant to the NPDES permit, and as a result, it can establish the affirmative defense of upset. First, the plaintiffs claim that this Court should not consider the argument because the City failed to plead this affirmative defense in its answer. It is true that the City does not specifically raise this defense in the "Affirmative Defenses" section of its answer. However, in admitting the allegation in paragraph 72 that an overflow occurred on July 19, 2007, the City claimed that it was a result of a power outage as a result of a thunderstorm. Thus, the plaintiffs were at least made aware that such a defense might be raised. Therefore, the Court declines to find a waiver of the defense and will address the issue on the merits. The plaintiffs also seek summary judgment on this issue because, they argue, the plain language of the permit prohibits overflows, and they assert that the City admitted to this overflow in its discharge monitoring report filed with TDEC.

An upset "means an exceptional incident in which there is unintentional and temporary noncompliance with technology-based effluent limitations because of factors beyond the reasonable control of the [City]." Additionally,

> An upset shall constitute an affirmative defense to an action brought for noncompliance with such technology-based permit effluent limitations if the [City] demonstrates, through properly signed, contemporaneous operating logs, or other relevant evidence that:
>
> i. An upset occurred and that the [City] can identify the

cause(s) of the upset;

ii. The permitted facility was at the time being operated in a prudent and workmanlike manner and in compliance with proper operation and maintenance procedures;

iii. The [City] submitted information required under "Reporting of Noncompliance" within 24-hours of becoming aware of the upset (if this information is provided orally, a written submission must be provided within five days); and

iv. The [City] complied with any remedial measures required under "Adverse Impact."

The plaintiffs state in their statement of undisputed material facts that the overflow occurred when "[d]amage to a power pole during a thunderstorm caused the power outage." Based on this information, and the factors set forth above, this Court FINDS that an issue of fact exists as to whether the City has established an affirmative defense of upset.

The plaintiffs also move for summary judgment on the basis that the City has violated its NPDES permit by failing to enforce the Industrial Pretreatment Program with regard to Koch Foods' violations. The permit requires that the City:

a. Carry out inspection, surveillance, and monitoring procedures which will determine, independent of information supplied by the Industrial user (IU), whether the IU is in compliance with the pretreatment standards;
b. Require development, as necessary, of compliance schedules for each IU for the installation of control

technologies to meet applicable pretreatment standards;

c. Require all industrial users to comply with all applicable monitoring and reporting requirements outlined in the approved pretreatment program and IU permit; [and]

d. Maintain and update, as necessary, records identifying the nature and character of industrial user discharges, and retain such records for a minimum of three (3) years[.]

The City maintains that it has enforced the program and lists several steps that it has taken in doing just that. Those actions are listed in detail above. The plaintiffs contend that these actions "have been completely ineffective." Again, there exists an issue of material fact as to whether the actions taken by the City constitute enforcement of the pretreatment program.

Lastly, the plaintiffs move for summary judgment on the basis that the City has violated its NPDES permit by failing to properly maintain the sewer system. The permit states that "[T]he permittee shall at all times properly operate and maintain all facilities and systems." As proof of this failure, the plaintiffs allege several instances where the system has malfunctioned. The City disputes these allegations. Again, there is an issue of fact as to whether the City has properly maintained the sewer system in accordance with the permit.

## IV. <u>STATE LAW CLAIMS</u>

The City moves for summary judgment as to all state law claims. Koch

Foods does not so move, although it did address briefly the private nuisance claim in its response to the plaintiffs' motion for summary judgment. This Court will discuss the City's arguments on the merits.

## A.     NUISANCE

The plaintiffs claim that unauthorized discharges into the City's sewer system cause odors on their property which constitute a public and private nuisance. They further allege that the City has "failed to take reasonable steps to prevent the substantial and unreasonable interference with the use and enjoyment by Plaintiffs of their property." They further allege that the "creation and maintenance of a nuisance has caused Plaintiffs to suffer loss of use, lost rental value and diminution in the value of their property." Finally, they claim that the City is "liable for the loss of quality of life and aggravation  and inconvenience suffered by Plaintiffs as a result of the nuisance."

The City argues that it is entitled to summary judgment on the nuisance claim because in order for a municipality to be held liable on a nuisance theory, plaintiffs  must establish an inherently dangerous condition and affirmative action on the part of the City. *Paduch v. City of Johnson City*, 896 S.W.2d 767, 771 (Tenn. 1995). The City argues that the plaintiffs cannot establish either. Moreover, the City does not address the allegations of public nuisance separately from private nuisance.

It merely claims that the plaintiffs have failed to "state a claim for nuisance."

The plaintiffs respond to the City's arguments only regarding a private, temporary nuisance. The plaintiffs distinguish *Paduch*, and they argue that the facts are analogous to *Pate v. City of Martin*, 614 S.W.2d 46 (Tenn. 1981). In reply, the City still relies upon *Paduch*, and it does not appear to separate its arguments in terms of public and private nuisances.

In *Paduch*, landowners sued Johnson City seeking damages for their cost of paving a portion of road abutting their property. 896 S.W.2d at 768. They claimed that this road was public. *Id*. Because the city refused to issue the landowners a building permit until the street was paved, the landowners also sued for loss of rent due to the delay in obtaining a building permit. *Id*. The trial court held that the facts alleged did not constitute an action to abate a nuisance or a tort action for negligence, but it found that the action was one for declaratory judgment and incidental damages. *Id*. The Tennessee Court of Appeals characterized the case as "a suit to abate a nuisance" and held that "the chancery court has inherent jurisdiction to abate a nuisance and in the same suit award damages for injuries caused by the nuisance, notwithstanding the Tennessee Governmental Tort Liability Act." *Id*. at 769. Accordingly, that court "affirmed the award of damages for the cost of paving the road and reinstated the award for the lost rent." *Id*. The parties and the lower courts,

however, could not agree as to the cause of action asserted. *Id*. The supreme court found that the court of appeals erred in finding that the case was one to abate a nuisance. *Id*. at 770. In reaching this finding, the court discussed the facts of *Pate*. In *Pate*, discussed in more detail below, the City's operation of a sewage lagoon was found to be a temporary nuisance. *Id*. The *Paduch* case stated regarding *Pate*, "In that case, the maintenance of the sewage lagoon was an affirmative act by the city which interfered with the plaintiff's use of their property." *Id*.

To further support the *Paduch* court's finding, the court summarized and discussed the facts of *Dean v. Bays Mountain Park Ass'n*, 551 S.W.2d 702, 704 (Tenn. Ct. App. 1977) (determining maintenance of a chain across an access road to bicycle trails in a public park did not constitute a nuisance for which the city could be liable), which set forth the standard for municipal liability for nuisance. *Id*. at 771. In order for a Tennessee municipality to be held liable for nuisance, the plaintiffs must establish "an inherently dangerous condition and affirmative action on the part of the municipality." *Id*. (quoting *Dean*, 551 S.W.2d at 704). Based on this standard, the supreme court concluded in *Paduch*, "There is no evidence that the condition of the street was inherently dangerous, created any danger, or caused any harm, nor has the city been charged with any affirmative action that caused the plaintiffs harm." *Id*. Therefore, the court found that the court of appeals had erred in concluding this was

an action to abate a temporary nuisance. *Id.*

In *Pate*, landowners brought suit seeking abatement of a nuisance and damages to real property as a result of the city operating a sewage lagoon near their property. 614 S.W.2d at 47. The supreme court stated that the evidence showed that "[t]he odor from the scum is so strong that it makes habitation of dwellings in the vicinity almost impossible." *Id.* The court found that "the lagoon as maintained is a nuisance in fact," and that it could be corrected "by the expenditure of labor and money on the part of the City." *Id.* at 48.

It is unclear to this Court why the supreme court did not apply the standard for municipal liability for nuisance announced in *Dean* to the facts in *Pate*. The supreme court in *Paduch* seemed to imply that such analysis occurred in *Pate* in that *Paduch* states the maintenance of the sewage lagoon was an "affirmative act" by the city. *Paduch*, 896 S.W.2d at 770. However, *Pate* did not address specifically whether the lagoon was an inherently dangerous condition. In addition, the *Dean* standard for municipal liability for a nuisance has not been overruled, and it was cited as recently as September 2008. See *Wilson v. Ours*, No. M2006-02703-COA-R3-CV, 2008 WL 4211117, at *5 (Tenn. Ct. App. September 3, 2008). Likewise, *Pate* has not been overruled. And, while *Paduch* announces the rule for determining a municipality's liability in a nuisance case, it was not a nuisance case. This Court

must then choose between two precedents which have not been overruled and both of which seem to apply in this case. Ultimately, this Court will apply the standard in *Paduch* because it is the later pronouncement of the Supreme Court, and the court did not appear to consider the rule announced in *Paduch* to be at odds with the decision in *Pate*.

Thus, although the plaintiffs did not use the words "inherently dangerous condition" and "affirmative act" in its complaint, mainly due to the decision in *Pate*, this Court FINDS that there is an issue of fact as to the City's liability for maintaining a temporary, private nuisance.[19]

## B. TRESPASS

The City also moves for summary judgment regarding the plaintiffs' trespass claim. The plaintiffs specifically allege that odorous gases and mists have entered their property without their permission. In addition, wastewater has entered the home of Plaintiff Patricia Stephens through the sewer pipes without her permission. The plaintiffs further allege that the City "knew that Koch Foods was

---

[19]This Court discerns from the City's filings that it did not specifically move for summary judgment regarding the allegations of a public nuisance pursuant to Tennessee Code Annotated section 69-3-114. *See* Tenn. Code Ann. § 69-3-114 (2009) ("It is unlawful for any person to discharge any substance into the waters of the state or to place or cause any substance to be placed in any location where such substances, either by themselves or in combination with others, cause any of the damages as defined in § 69-3-103(22), unless such discharge shall be due to an unavoidable accident or unless such action has been properly authorized. Any such action is declared to be a public nuisance.").

-56-

discharging the wastewater to a location where the discharge would result in odorous gases and mists entering the property of Plaintiffs[,] and the discharge[s] were of the nature that would interfere with the Morristown sewer system causing it to backup onto the property of others downstream."

The City argues first that it is immune from this trespass suit pursuant to the Tennessee Governmental Tort Liability Act ("GTLA"). It claims that the GTLA does not remove immunity for this particular type of action. The plaintiffs argue to the contrary and cite *Pate* and *Burchfiel v. Gatlinburg Airport Authority*, No. E2005-02023-COA-R3-CV, 2006 WL 3421282, at *6-8 (Tenn. Ct. App. Nov. 28, 2006), for support.

In *Pate*, discussed in more detail above, immunity was not specifically at issue; however, the decision that the city must abate the nuisance was upheld. More on point, the appellate court decided in *Burchfiel* that the "GTLA does not preclude an injunction to address a governmental entity's trespass." 2006 WL 3421282, at *8. In that case, the plaintiffs filed their trespass action against the Gatlinburg Airport Authority, seeking an injunction and damages because the Airport Authority constructed a sign within a right-of-way which the plaintiffs had conveyed. *Id*. at *1. The Airport Authority argued that it was immune pursuant to Tennessee Code Annotated section 29-20-205(2), *id*. at *6, which states that, "[i]mmunity from

suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment except if the injury arises out of . . . intentional trespass." Tenn. Code Ann. § 29-20-205(2).

The court held that the statute did not apply, however, because the Airport Authority did not negligently construct the sign, but it "took affirmative and intentional steps to erect the sign." *Id*. at *7. The court went on to hold that the GTLA did not bar suit for injunctive relief, unlike cases for damages. *Id*. The court also compared the trespass action to a situation where plaintiffs sue for an injunction to abate a nuisance. *Id*. (citing *Jones v. Louisville & Nashville R.R. Co.*, No. 85-134-II, 1986 WL 3435 (Tenn. Ct. App. Mar. 21, 1986)). In an action seeking an injunction for the abatement of a nuisance, the court had held, "There is nothing in the [GTLA] which removes the inherent power of a court of equity to abate a nuisance created by a governmental entity." *Id*. Thus, the court likewise held, "The reasoning of this case as it pertains to nuisances applies with equal force to the trespass present in this case. The GTLA does not preclude an injunction to address a governmental entity's trespass." *Id*. at *8.

The City seeks to distinguish *Burchfiel* from the current situation and argues, "The *Burchfiel* Court held only that a claim for trespass could proceed against a government entity when the actions of the government entity are affirmative and

intentional as opposed to being negligent. Immunity still applies where the alleged trespass is based in negligence, as in the case at bar." It is true that *Burchfiel* addressed the situation where the governmental entity acted in an affirmative way, instead of negligently.[20] However, this Court finds that the more important fact upon which the *Burchfiel* Court based its decision was that it was a case for injunctive relief, to which the governmental entity typically is not immune under Tennessee law.

As to the merits of the trespass action, the City argues that it is entitled to summary judgment because Tennessee follows the "traditional view" of trespass which requires "direct entry onto the land by a tangible object."[21] The City found no Tennessee case extending this view to odors or other intangibles. For support, the City cites *Morrison v. Smith*, 757 S.W.2d 678, 681-82 (Tenn. Ct. App. 1988), which

---

[20]This Court notes that the Second Restatement of Torts states, "One who recklessly or negligently, or as a result of an abnormally dangerous activity, enters land in the possession of another or causes a thing or third person so to enter is subject to liability to the possessor if, but only if, his presence or the presence of the thing or the third person upon the land causes harm to the land, to the possessor, or to a thing or a third person in whose security the possessor has a legally protected interest." Restatement (Second) of Torts § 165 (2009). Comment (b) states, "There is this fundamental and vital difference between the liability stated in this Section and the liability for intentional intrusions stated in § 158. In the latter case, liability is imposed even though the intrusion is transitory or harmless or even beneficial. (See § 163.) On the other hand, where the entry or remaining on the land, although tortious, is not intentional, the actor is only liable if harm of the sort stated in Comment c results as a legal consequence from his tortious conduct." Restatement (Second) of Torts § 165 cmt. b.

[21]The City does not seek summary judgment for the claim relating to the sewage directly entering Plaintiff Stephens' home.

stated in dicta, "If the release of noxious fumes or beams of light onto lands of another cannot be considered a trespass, we cannot conceive that the absence of electricity or water can be considered as such either. *Id*. at 682.

The plaintiffs, on the other hand, argue that the "modern trend" in trespass law is to allow an action based on intangible entries. They cite several courts for this proposition, *see, e.g., H.E. Stevenson v. E.I. Dupont De Nemours & Co.*, 327 F.3d 400 (5th Cir. 2003) (interpreting Texas law to allow for recovery in trespass for airborne particulates); *Mercer v. Rockwell Int'l Corp.*, 24 F.Supp.2d 735 (W.D. Ken. 1998) (invisible PCBs); *Williams v. Oeder*, 659 N.E.2d 379 (Ohio App. 1995) (airborne particulates); *Borland v. Sanders*, 369 So.2d 523 (Ala. 1979) (lead particulates and sulfoxide deposits); *Garner v. Walker*, 577 So.2d 1276 (Ala. 1991) (noise and dust); *Ream v. Keen*, 828 P.2d 1038, 1040 (Or. App. 1992) (smoke); *Martin v. Reynolds Metals Co.*, 342 P.2d 790 (Or. 1959), *cert denied*, 362 U.S. 918 (1959) (fluoride compounds in the form of gases and particulates); however, they admittedly cannot cite a Tennessee case adopting this view.

The statement in *Morrison* is pure dicta. In addition, that case was a landlord-tenant dispute, and the question was whether the act of turning off the tenant's utilities constituted a trespass. 757 S.W.2d at 682. There was no physical invasion of any kind, unlike in the present case where the plaintiffs allege that

odorous gases entered their property. As such, this Court will not follow the dicta. Instead, it will adopt the "modern" view of trespass. Accordingly, there is an issue of fact as to this issue.

## C.    INVERSE CONDEMNATION

The City claims it is entitled to summary judgment on the inverse condemnation claim because, pursuant to *Edwards v. Hallsdale-Powell Utility District, Knox County, Tennessee*, 115 S.W.3d 461, 467 (Tenn. 2003), the governmental defendant must have performed "a purposeful or intentional act" for a taking to occur. Further, the City argues that the only allegation of a purposeful or intentional act is that the City assisted Koch Foods in locating to the ETPC. This conduct, the City argues, is not sufficient to establish the purposeful or intentional conduct to constitute a taking. In addition, the City argues that an alleged failure to maintain a sewer system does not constitute a taking. *See id*.

The plaintiffs argue that the City (1) intentionally and purposefully operates the sewer system; (2) intentionally and purposefully authorizes discharges into the system, including those from Koch Foods; and (3) intentionally and purposefully failed to remedy the odor problems on the sewer line after repeated complaints. Furthermore, they distinguish *Edwards* on the basis that the overflows to the sewer system in that case were caused by tree roots and not acts of the

defendant.

The plaintiffs' claim that there was a taking because the City intentionally and purposefully operates the sewer system fails. The court in *Edwards* stated, "If the back up was caused by the failure of [the defendant] to meet its obligation to operate and maintain its sewer system as alleged, its failure would constitute negligence, not a taking." *Id*. As such, as to this theory, the plaintiff cannot maintain an inverse condemnation action. However, as to the last two possible theories, this Court FINDS that there is an issue of fact regarding whether the City acted purposefully or intentionally. Those theories on the inverse condemnation claim will move forward.

V.    **CONCLUSION**

For the reasons set forth above in great detail, it is hereby **ORDERED** that all motions are **GRANTED IN PART AND DENIED IN PART**. More specifically, this Court FINDS that the plaintiffs have standing to file the citizen CWA suit. Therefore, Koch Foods' and the City's motions for summary judgment are **DENIED** in that regard, and the plaintiffs' motion is **GRANTED** in that respect. Regarding the notice requirements, this Court FINDS that the plaintiffs did not provide adequate notice as to alleged violations relating to pH and excessive flow. Further, it did not provide adequate notice for any violations occurring after March

20, 2007. Therefore, this Court does not have subject matter jurisdiction over those alleged violations. As such, Koch Foods' motion is **GRANTED** in this respect. Likewise, this Court only has subject matter jurisdiction over the July 19, 2007overflow because it is the only overflow to which the Plaintiffs provided adequate notice. The City's motion is **GRANTED** in this respect. In addition, Koch Foods' motion for summary judgment is **GRANTED** in so far as there is no genuine issue of material fact as to whether the IU permit for Plant 1 was transferred to Plant 2 or whether that permit was timely renewed. The permit was so transferred and renewed.

Regarding the substantive CWA claims, Koch Foods motion and the plaintiffs' motions are both **DENIED** because there is a genuine issue of material fact as to whether Koch Foods violated the CWA. Similarly, the City's and the plaintiffs' motions are **DENIED** as to whether the City violated the CWA because there is a genuine issue of material fact for trial.

Finally, regarding the City's motion on the nuisance claim, the City's motion is **GRANTED** in so far as that in order for a Tennessee municipality to be held liable for nuisance, the plaintiffs must establish "an inherently dangerous condition and affirmative action on the part of the municipality." However, the motion is **DENIED** because there is a genuine issue of material fact as to whether

-63-

there is an inherently dangerous condition and affirmative action on the part of the City.  Regarding the trespass claim, the City's motion in **DENIED** because the GTLA does not apply in this situation.  In addition, this Court adopted the modern trend in trespass law.  As such, the City's motion is **DENIED** also because there is a genuine issue of material fact as to whether the noxious odors from the sewer system constitute a trespass onto the plaintiffs' properties.  Lastly, regarding the inverse condemnation claim, a governmental defendant must have performed "a purposeful or intentional act" for a taking to occur.  There is no genuine issue of material fact as to the plaintiffs' first theory on how the City acted intentionally and purposefully in taking their properties. Thus, in that regard, the City's motion is **GRANTED**.  As to the plaintiffs' other two theories, there is a genuine issue of material fact as to whether the City acted intentionally and purposefully in taking their properties. Accordingly, in that regard, the City's motion is **DENIED**.

**s/J. RONNIE GREER**
**UNITED STATES DISTRICT JUDGE**